AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

2020 JAN 29 AM 9: 37

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WESTERN DIVISION AT

SHARON L. OVINGTON

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Samsung cellular telephone, Model SM-A600P, IMEI 357830091223809, currently located at the Federal Bureau of Investigation, 7747 Clyo Rd., Centerville, OH

)
)
)
)
)
)

Case No. 3.20 mj 051

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| See Attachment C | |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Andrea R. Kinzig, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1-29-20

_____
*Judge's signature*

City and state: Dayton, Ohio

Sharon L. Ovington, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### DESCRIPTION OF PROPERTY TO BE SEARCHED

The property to be searched is a Samsung cellular telephone, Model SM-A600P, IMEI 357830091223809 (**"SUBJECT DEVICE"**).  The SUBJECT DEVICE is currently located at the Federal Bureau of Investigation, 7747 Clyo Road, Centerville, Ohio, 45459.

This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

### LIST OF ITEMS TO BE SEIZED AND SEARCHED

Items evidencing violations of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(1) and 2252A(a)(5)(B) and (b)(1) (possession and attempted possession of child pornography) and 18 U.S.C. §§ 2252(a)(2)(B) and (b)(1) and 2252A(a)(2) and (b)(1) (receipt and attempted receipt of child pornography), including but not limited to the following:

1. Any visual depictions and records related to the possession and receipt of child pornography.

2. Any visual depictions of minors.

3. Any Internet history indicative of searching for child pornography.

4. Any Internet or cellular telephone communications (including email, social media, online chat programs, etc.) with others in which child exploitation materials and offenses are discussed and/or traded.

5. Any Internet or cellular telephone communications (including email, social media, etc.) with minors.

6. Evidence of utilization of email accounts, social media accounts, online chat programs, and peer-to-peer file sharing programs.

7. Lists of computer and Internet accounts, including user names and passwords.

8. Any information related to the use of aliases.

9. Evidence of user attribution showing who used or owned the SUBJECT DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

The authorization includes the seizure and search of electronic data to include deleted data, remnant data and slack space.

## ATTACHMENT C

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §2252(a)(4)(B) & (b)(1) | Possession of Child Pornography |
| 18 U.S.C. §2252A(a)(5)(B) & (b)(1) | Possession of Child Pornography |
| 18 U.S.C. §2252(a)(2)(B) & (b)(1) | Receipt of Child Pornography |
| 18 U.S.C. §2252A(a)(2) & (b)(1) | Receipt of Child Pornography |

## <u>AFFIDAVIT IN SUPPORT OF SEARCH WARRANT</u>

I, Andrea R. Kinzig, being duly sworn, depose and state the following:

## **INTRODUCTION**

1.  I make this Affidavit in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property — an electronic device — which is currently in law enforcement's possession, and the extraction from that property of electronically stored information described in Attachment B.

2.  I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been so employed since 2005.  I am currently assigned to the Dayton, Ohio Resident Agency of the Cincinnati Field Office.  In connection with my official duties, I investigate violations of federal criminal laws, including offenses pertaining to the illegal production, distribution, receipt, and possession of child pornography (in violation of 18 U.S.C. §§ 2252(a) and 2252A).  I have received training in the area of child pornography and child exploitation and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in various forms of media, including computer media.

3.  Along with other agents, officers, and investigators of the FBI, I am currently involved in an investigation of child pornography offenses committed by JOHN CLARENCE GOLDEN JR. (hereinafter referred to as "GOLDEN").  This Affidavit is submitted in support of an Application for a search warrant for the following:

    a.  Samsung cellular telephone, Model SM-A600P, IMEI 357830091223809 (hereinafter referred to as the "**SUBJECT DEVICE**");

4.  The **SUBJECT DEVICE** is currently located at the Federal Bureau of Investigation, 7747 Clyo Road, Centerville, Ohio, 45459.  The purpose of the Application is to search for and seize evidence of the following violations:

    a.  18 U.S.C. §§ 2252(a)(4)(B) and (b)(1) and 2252A(a)(5)(B) and (b)(1), which make it a crime to possess or attempt to possess child pornography; and

    b.  18 U.S.C. §§ 2252(a)(2)(B) and (b)(1) and 2252A(a)(2) and (b)(1), which make it a crime to receive or attempt to receive child pornography through interstate commerce.

5.  The items to be searched for and seized are described more particularly in Attachment B hereto and are incorporated by reference.

1

6.     As part of the investigation, I have reviewed documentation and reports provided by and discussed information with other agents, officers, and investigators involved in the investigation. For purposes of this Affidavit, I have not distinguished between information of which I have direct knowledge and that of which I have hearsay knowledge.

7.     This Affidavit does not contain every fact known to the investigation, but only those facts deemed necessary to demonstrate sufficient probable cause to support the search of the **SUBJECT DEVICE**.

8.     As a result of the instant investigation described more fully below, there is probable cause to believe that evidence of a crime; contraband, fruits of crime, or other items illegally possessed; property designed for use, intended for use, or used in committing a crime of violations of federal law; including violations of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(1), 2252A(a)(5)(B) and (b)(1), 2252(a)(2)(B) and (b)(1), and 2252A(a)(2) and (b)(1), are present within the information located on the **SUBJECT DEVICE**.

## PERTINENT FEDERAL CRIMINAL STATUTES

9.     18 U.S.C. § 2252(a)(4)(B) and (b)(1) states that it is a violation for any person to knowingly possess, or knowingly access with the intent to view, one or more matters which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct, or attempt to do so.

10.     18 U.S.C. § 2252A(a)(5)(B) and (b)(1) states that it is a violation for any person to knowingly possess, or knowingly access with intent to view, any book, magazine, periodical, film, videotape, computer, disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer, or attempt to do so.

11.     18 U.S.C. § 2252(a)(2)(B) and (b)(1) states that it is a violation for any person to knowingly receive or distribute any visual depiction using any means or facility of interstate or foreign commerce or that has been mailed, shipped, or transported in or affecting interstate or foreign commerce or which contains materials which have been mailed or so shipped or transported by any means, including by computer, or to

knowingly reproduce any visual depiction for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct, or attempt to do so.

12.     18 U.S.C. § 2252A(a)(2) and (b)(1) states that it is a violation for any person to receive or distribute – (A) any child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; and (B) any material that contains child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer, or attempt to do so.

## **BACKGROUND INFORMATION**

### Definitions

13.     The following definitions apply to this Affidavit and Attachment B to this Affidavit:

    a.     "**Child Pornography**" includes the definition in Title 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

    b.     "**Visual depictions**" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image (see 18 U.S.C. § 2256(5)).

    c.     "**Minor**" means any person under the age of eighteen years (see 18 U.S.C. § 2256(1)).

    d.     "**Sexually explicit conduct**" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person (see 18 U.S.C. § 2256(2)).

    e.     "**Internet Service Providers**" or "**ISPs**" are commercial organizations which provide individuals and businesses access to the Internet. ISPs provide a range of

3

functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer various means by which to access the Internet including telephone based dial-up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and password.

f.　　An "**Internet Protocol address**", also referred to as an "**IP address**", is a unique numeric address that computers or electronic devices use in order to communicate with each other on a computer network utilizing the Internet Protocol (IP) standard. Every computer or device connected to the Internet is referenced by a unique IP address. An IP address can be thought of as the equivalent to a street address or a phone number, just as each street address and phone number uniquely identifies a building or telephone. IP addresses are composed of four sets of digits known as "octets," ranging in value from 0-255, separated by decimal points. An example of an IP address is 192.168.10.102. There are two types of IP addresses; static and dynamic. A static address is permanently assigned to a particular device and as a practical matter never changes. A dynamic address provided by an Internet service provider to a client computer is valid only for the duration of the session that the client computer is connected to the Internet (or other network).

g.　　A network "**server**," also referred to as a "**host**," is a computer system that has been designated to run a specific server application or applications and provide requested services to a "client" computer. A server can be configured to provide a wide variety of services over a network, including functioning as a web server, mail server, database server, backup server, print server, FTP (File Transfer Protocol) server, DNS (Domain Name System) server, to name just a few.

h.　　A "**client**" is the counterpart of a server or host. A client is a computer system that accesses a remote service on another computer by some kind of network. Web browsers (like Internet Explorer or Safari) are clients that connect to web servers and retrieve web pages for display. E-mail clients (like Microsoft Outlook or Eudora) retrieve their e-mail from their Internet service provider's mail storage servers.

i. "**Domain Name**" refers to the common, easy to remember names associated with an Internet Protocol address. For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first level, or top level domains are typically ".com" for commercial organizations, ".gov" for the governmental organizations, ".org" for organizations, and, ".edu" for educational organizations. Second level names will further identify the organization, for example "usdoj.gov" further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government. The Domain Name System, also referred to DNS, is a system of servers connected to each other using a common system of databases that resolve a particular domain name, such as "www.usdoj.gov," to its currently assigned IP address (*i.e.,* 149.101.1.32), to enable the follow of traffic across the Internet.

j. "**Log Files**" are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

k. "**Hyperlink**" (often referred to simply as a "link") refers to a navigation element in a web page or document that automatically brings the referred information (a.k.a. "resource") to the user when the navigation element is selected by the user. Hyperlinks are part of the foundation of the World Wide Web, but are not limited to a website for HTML.

l. "**Website**" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

m. "**Uniform Resource Locator**" or "**Universal Resource Locator**" or "**URL**" is the unique address for a file that is accessible on the Internet. For example, a common way to get to a website is to enter the URL of the website's home page file in the Web browser's address line. Additionally, any file within that website can be specified with a URL. The URL contains the name of the protocol to be used to access the file resource, a domain name that identifies a specific computer

on the Internet, and a pathname, a hierarchical description that specifies the location of a file in that computer.

n.   The terms "**records**," "**documents**," and "**materials**," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

### Collectors of Child Pornography

14.   Based upon my knowledge, training, and experience in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the collection of child pornography (hereafter "collectors"):

a.   Collectors may receive sexual stimulation and satisfaction from contact with children, or from having fantasies of children engaged in sexual activity or suggestive poses, or from literature describing such activity.

b.   Collectors may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Collectors typically use these materials for their own sexual arousal and gratification. Collectors often have companion collections of child erotica. Child erotica are materials or items that are sexually suggestive and arousing to pedophiles, but which are not in and of themselves obscene or pornographic. Such items may include photographs of clothed children, drawings, sketches, fantasy writings, diaries, pedophilic literature and sexual aids.

c.   Collectors who also actively seek to engage in sexual activity with children may use these materials to lower the inhibitions of a child they are attempting to seduce, convince the child of the normalcy of such conduct, sexually arouse their selected child partner, or demonstrate how to perform the desired sexual acts.

d.      Collectors almost always possess and maintain their "hard copies" of child pornographic images and reference materials (e.g., mailing and address lists) in a private and secure location.  With the growth of the Internet and computers, a large percentage of most collections today are in digital format.  Typically these materials are kept at the collector's residence for easy access and viewing.  Collectors usually place high value on their materials because of the difficulty, and legal and social danger, associated with acquiring them.  As a result, it is not uncommon for collectors to retain child pornography for long periods of time, even for years.  Collectors often discard child pornography images only while "culling" their collections to improve their overall quality.

e.      Collectors also may correspond with and/or meet others to share information and materials.  They may save correspondence from other child pornography distributors/collectors, including contact information like email addresses, and may conceal such correspondence as they do their sexually explicit material.

f.      Collectors prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

g.      Subscribers to websites that are primarily designed to provide child pornography have a strong likelihood of being collectors of child pornography.  This high degree of correlation between subscription and collection behavior has been repeatedly confirmed during several recent nationwide law enforcement initiatives.

### Use of Computers and the Internet with Child Pornography

15.     Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  It has also revolutionized the way in which child pornography collectors interact with each other, as well the methods that individuals will use to interact with and sexually exploit children.  Computers serve four functions in connection with child pornography: production; communication; distribution and storage.

a.      **Production**: Pornographers can now produce both still and moving images directly from a common video camera.  The camera is attached, using a cable, directly to the computer using a device called a video capture board.  This device turns the video output into a form that is usable by computer programs.  The output of the video camera can be stored, manipulated, transferred or printed directly from the computer.  The captured image can be edited (*i.e.,* lightened, darkened, cropped, digitally enhanced, *etc.*) with a variety of commonly available graphics programs.  The producers of child pornography can also use scanners to convert hard-copy photographs into digital images.

b.　**Communication**.  Previously, child pornography collectors had to rely on personal contact, U.S. mail, and telephonic communications in order to sell, trade, or market pornography.  Today most communications associated with the trafficking of child pornography occur via the obscurity and relative anonymity of the Internet.  A device known as a modem allows any computer to connect to the Internet via telephone lines or broadband Internet connections.  Once connected to the Internet, individuals search for and/or offer to distribute child pornography in a wide variety of ways.  Many individuals congregate in topic-based Internet chat rooms implicitly or explicitly dedicated to child pornography.  Online discussions in these chat rooms are usually done via instant message (or "IM"), and individuals may then establish one-on-one chat sessions involving private messages (or "PMs"), visible only to the two parties, to trade child pornography.  These child pornography images may be attachments to the PMs, or they may be sent separately via electronic mail between the two parties.  Pedophile websites communicate advertisements for the sale of child pornography, and individuals may order child pornography from these websites using email or send order information from their web browser (using HTTP computer language).  Some individuals communicate via Internet Relay Chat (IRC) to discuss and trade child pornography images.  It is not uncommon for child pornography collectors to engage in mutual validation of their interest in such material through Internet-based communications.

c.　**Distribution**.  Computers and the Internet are the preferred method to distribute child pornography.  As discussed above, such images may be distributed via electronic mail (either as an attachment or embedded image), or through instant messages as attachments.  Child pornography is regularly downloaded from servers or Usenet newsgroups via a method known as FTP (file transfer protocol).  Child pornography images are also distributed from websites via client computers web browsers downloading such images via HTTP (Hyper Text Transfer Protocol).  Peer-to-peer networks such as LimeWire and Gnutella are an increasingly popular method by which child pornography images are distributed over the Internet.

d.　**Storage**.  The computer's capability to store images in digital form makes it an ideal repository for pornography.  A single floppy disk can store dozens of images and hundreds of pages of text.  The size of computer hard drives used in home computers has grown tremendously within the last several years.  Hard drives with the capacity of two hundred (200) gigabytes are not uncommon.  These drives can store thousands of images at very high resolution.  Remote storage of these images on servers physically removed from a collector's home computer adds another dimension to the equation.  It is possible to use a video camera to capture an image, process that image in a computer with a video capture board,

and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the scene of the crime. Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

## FACTS SUPPORTING PROBABLE CAUSE

16. On or August 12, 1994, GOLDEN was convicted in the King County (Washington) Superior Court of one count of Rape of a Child in the Second Degree, in violation of Revised Code of Washington (RCW) Section 9A.44.076. As a result of this conviction, GOLDEN is currently required to register as a sex offender.

17. On or around June 13, 2003, GOLDEN pled guilty to a Bill of Information filed in the United States District Court for the Southern District of Ohio charging him with one count of Coercion and Enticement of a Minor For the Purpose of Criminal Sexual Activity after a Prior Sex Offense Conviction, in violation of 18 U.S.C. § 2422(b) and 18 U.S.C. § 2426. The underlying offense conduct for this conviction involved GOLDEN engaging in sexually explicit conduct with a 10-year old female child while traveling on a bus from Arizona to Pennsylvania. GOLDEN was sentenced to 210 months imprisonment followed by five years of supervised release. As a result of this conviction, GOLDEN is again currently required to register as a sex offender.

18. On or around March 21, 2018, GOLDEN was released from the custody of the Bureau of Prisons and began his term of supervised release. He was supervised at that time by the United States Probation Service in the Western District of Pennsylvania. Among other conditions, the terms of GOLDEN's supervised release included the following:

    a. GOLDEN was prohibited from entering into a rental agreement for and/or purchasing computers, cellular telephones, or electronic communication or data storage devices without the consent of his probation officer. His probation officer did not authorize GOLDEN to possess any such devices.

    b. GOLDEN was required to consent to the installation of any hardware or software to monitor any computer or other electronic communication or data storage devices used by him.

    c. GOLDEN was required to truthfully answer all inquiries of his probation officer and to follow instructions of his probation officer.

    d. GOLDEN was required to participate in a mental health and/or sex offender treatment program approved by the probation officer, and to abide by all of the rules, requirements, and conditions of the program.

19. On or around June 27, 2018, GOLDEN's probation officer in the Western District of Pennsylvania filed a petition requesting that GOLDEN's supervised release be revoked. The petition alleged that GOLDEN violated the conditions of his supervised released that are detailed above for the following reasons:

   a. GOLDEN was found to be in possession of a smartphone that was not previously authorized by his probation officer.

   b. Review of GOLDEN's smartphone identified that he had accessed websites in order to seek sexual encounters in the Pittsburgh, Pennsylvania area. GOLDEN also admitted to his probation officer that he had taken pictures on his smartphone of a female co-worker without her knowledge, and that these photographs were taken for his own sexual gratification. These behaviors were found by his probation officer to be a violation of his sex offender treatment program.

20. On or around December 12, 2018, Honorable Judge Walter H. Rice (of the United States District Court for the Southern District of Ohio) filed a decision and entry order finding GOLDEN to be in violation of his supervised release. Judge Rice sentenced GOLDEN to 13 months of imprisonment followed by an additional 47 month period of supervised release.

21. On or around June 14, 2019, GOLDEN was released from the custody of the Bureau of Prisons and began his term of supervised release. Since his release, GOLDEN has been supervised by Probation Officer (PO) Christopher Owens of the United States Probation Service in the Southern District of Ohio. Among other conditions, the terms of GOLDEN's supervised release included the following:

   a. GOLDEN was prohibited from viewing or possessing materials, images, videos, or computer files containing sexually explicit conduct as defined by 18 U.S.C. § 2256(2)(A) and (B).

   b. GOLDEN was prohibited from using a computer or the Internet in any manner that relates to possessing sexually explicit material.

22. On or around January 22, 2020, PO Owens filed a petition requesting that GOLDEN's supervised release be revoked. The petition alleged that GOLDEN violated the conditions of his supervised release that are detailed above for the following reason:

   a. On or around January 16, 2020, PO Owens inspected the **SUBJECT DEVICE** (a device that PO Owens had previously authorized GOLDEN to utilize). PO Owens observed images on the **SUBJECT DEVICE** containing sexually explicit conduct and websites indicative of sexually explicit conduct.

10

23.    I have discussed GOLDEN's alleged violations with PO Owens.  In summary, I have learned the following information from PO Owens:

   a.    PO Owens authorized GOLDEN to possess the **SUBJECT DEVICE**.  Pursuant to the conditions of GOLDEN's supervised release, PO Owens was authorized to search the **SUBJECT DEVICE** upon request.  GOLDEN has not requested or received authorization from PO Owens to possess any other electronic devices.  As such, he is prohibited by the terms of his supervised release from possessing any other electronic devices.

   b.    GOLDEN currently resides in room 252 of the InTown Suites Extended Stay Hotel, located at 8981 Kingsridge Drive, Dayton, Ohio, 45458 (hereinafter referred to as the "SUBJECT PREMISES").  PO Owens routinely conducts home visits at the SUBJECT PREMISES every approximately 30 days.  PO Owens also typically conducts manual inspections of the **SUBJECT DEVICE** during these home visits.

   c.    On or around January 16, 2020, PO Owens conducted a home visit at the SUBJECT PREMISES.  PO Owens asked to inspect the **SUBJECT DEVICE**, which was lying in plain view on a table in the SUBJECT PREMISES.  The device was locked, and GOLDEN unlocked it using his fingerprint.  PO Owens asked GOLDEN to access the Photo Gallery of the **SUBJECT DEVICE**, and GOLDEN complied.  While GOLDEN quickly scrolled through the images in the Photo Gallery, PO Owens observed two images that appeared to depict nude juvenile females.  One of these images was a collage that depicted thumbnail images of multiple apparent juvenile females.  PO Owens stopped reviewing the images at that time and seized the **SUBJECT DEVICE**.

   d.    PO Owens questioned GOLDEN about the nude images found on the **SUBJECT DEVICE**.  GOLDEN claimed that someone must have sent him a text message that contained the images, and that he had not viewed the images.

   e.    After seizing the **SUBJECT DEVICE**, PO Owens captured screen prints of the two sexually explicit images he observed on the **SUBJECT DEVICE**.  PO Owens noted that the two images appeared to be screen prints of content that was displayed on a cellular telephone.  The top portion of the images appeared similar to the top panel of the **SUBJECT DEVICE**, therefore leading PO Owens to believe that these images may have been screen prints of content that GOLDEN had viewed on the **SUBJECT DEVICE**.

   f.    PO Owens also briefly reviewed the Internet browser history of the **SUBJECT DEVICE**, and he and took screen prints of some of the websites captured in the browser history.

11

24. PO Owens showed me the screen prints that he took of the two sexually explicit images he observed on the **SUBJECT DEVICE**. The images are described as follows:

a. One image depicts approximately seven thumbnail images of nude females, as well as approximately six other thumbnail images in which most of the content was cut off from the view of the camera or screen print. Based on my training and experience, I believe that at least five of the seven thumbnail images in fact depict nude female children, and at least three of the seven thumbnail images depict child pornography. The thumbnail images depicting apparent child pornography are described as follows:

    i. One image depicts what appears to be a nude pre-pubescent female child sitting on a couch with her legs spread apart, exposing her nude vagina to the camera.

    ii. One image depicts what appears to be a nude pre-pubescent female child lying on her back in a bathtub with her legs straddled above her, exposing her nude vagina to the camera.

    iii. One image depicts what appears to be two nude pre-pubescent female children. One child is kneeling on her hands and knees, exposing her nude anus to the camera. The other child is sitting next to the first child's anus.

b. One image depicts a full-size image of one of the thumbnail images detailed above. This image depicts what appears to be a nude pre-pubescent female child walking near a swimming pool. The child is carrying in a paper or card with a number written on it.

25. PO Owens also showed me the screen prints that he took of the browser history found on the **SUBJECT DEVICE**. I found that the titles and URL's for some of the entries in the browser history are consistent with websites that contain sexually explicit images, videos, and/or other content of children and teenagers. However, I have not accessed the websites at this time to determine their actual contents. By way of example, two of the entries in the browser history are as follows:

a. A website containing the partial title of "My-Fruits Preteen FORUM Ind…" (the rest of the title was not captured in the screen print) and a URL of nn-forums.net

b. A website containing a title of "Jbcam – Jailbait[1] Girls Form" and a URL of artbbs.to

---

1 Jailbait is a slang term that typically refers to a person who is younger than the legal age of consent for sexual activity.

26. After seizing the **SUBJECT DEVICE**, PO Owens secured it at the United States Probation Service's office in Dayton, Ohio. On or around January 27, 2020, I collected the **SUBJECT DEVICE** from PO Owens and secured it at the FBI's office located at 7747 Clyo Road, Centerville, Ohio, 45459. The **SUBJECT DEVICE**'s electronic contents have not been accessed or searched while in the FBI's custody.

27. Records from the Montgomery County (Ohio) Sheriff's Office indicate that GOLDEN has been compliant in registering his address as required by his sex offender registration requirements. The records identified that GOLDEN has resided at the **SUBJECT PREMISES** since on or around August 27, 2019. Based on this information, as well as the information provided by PO Owens (as detailed above), there is probable cause to believe that GOLDEN currently resides at the **SUBJECT PREMISES**.

28. Based on all of the information detailed above, there is probable cause to believe that GOLDEN is the user of the **SUBJECT DEVICE**. There is also probable cause to believe that GOLDEN utilized the **SUBJECT DEVICE** to possess and receive child pornography.

<u>Additional Background Information on Searches of Electronic Devices</u>

29. Based on my training and experience, I know that individuals are increasingly utilizing laptop computers and other smaller devices such as cellular telephones, iPads, and tablets to do their computing.

30. Based on my training and experience, I know that collectors of child pornography often maintain their collections for long periods of time. In addition, computer evidence typically persists for long periods of time, and computer data can often be recovered from deleted space (as further detailed above).

31. Based on my training and experience, individuals involved in child exploitation schemes often utilize social media accounts, email addresses, messenger applications, and dating websites as a means to locate and recruit victims. They then use the chat functions on these websites, as well as email accounts and other messenger applications, to communicate with their victims. Such communications provide a means of anonymity to protect the subjects' identities and to conceal the communications from the victims' parents.

32. Also based on my training and experience, I know that individuals involved in child exploitation offenses utilize a variety of threats and manipulation techniques to compel their victims to engage or continue engaging in the illicit sexual activities (including the production of child pornography). These threats and manipulations are intended to control the victims and their activities, prevent them from stopping the activities, and prevent them from contacting law enforcement officers. It is common for such offenders

to threaten that if the victims end the illicit sexual activities, the offenders will harm the victims and their family members and / or bring notoriety and shame to the victims by exposing the victims' involvement in the sexually explicit conduct.

33. In my experience, individuals involved in child exploitation schemes often communicate with others involved in similar offenses via e-mail, social media, and other online chatrooms. I have seen examples of cases where such individuals have communicated with other child predators about their sexual fantasies and prior sexual activities with juveniles. I have also seen cases where such individuals have communicated with others about their remorse and regret for their activities. Both types of communications provide material evidence in child exploitation cases in that they provide admissions of guilt.

34. In my experience, individuals often attempt to obtain child pornography from a variety of sources, including from those with whom they communicate via email, social media sites, Internet chat programs, and on Internet bulletin boards; Internet P2P file sharing programs; Internet websites; and other sources. Evidence of multiple aliases, accounts, and sources of child pornography can often be found in the subjects' email communications. Evidence of the multiple aliases, accounts, and sources of child pornography are often found on the computer devices located at the offenders' residences, in their vehicles, and on their persons.

35. In my experience, I know that due to the covert nature of the devices, individuals involved in child pornography offenses also utilize their cellular telephones to take photographs of children and produce child pornography. As detailed above, GOLDEN utilized his smartphone during his period of supervised release in 2018 to take covert pictures of his adult co-worker. Based on inspection of the exterior of the device, it appears that the **SUBJECT DEVICE** has a camera.

36. In my experience, I know that many cellular telephones, iPads, and tablets store information related to IP addresses and Wi-Fi accounts that the telephone accessed and GPS data. This information helps in identifying the subjects' whereabouts during the criminal activities and the travels they took to get to these locations.

37. Based on my training and experience, I know that providers of cellular telephone service and Internet Service Providers often send their customers monthly billing statements and other records. These statements and records are sometimes mailed to the customers' billing addresses and other times are emailed to the customers' email accounts. Individuals often maintain these documents in their residences and/or on their computers. These documents can be materially relevant to investigations of child exploitation offenses in that they provide evidence of the Internet and cellular telephone accounts utilized in furtherance of the crimes.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

38.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

39.     There is probable cause to believe that things that were once stored on the **SUBJECT DEVICE** may still be stored there, for at least the following reasons:

   a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

   d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

40.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **SUBJECT DEVICE** was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **SUBJECT DEVICE** because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

41.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

42.   *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve

16

the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

43. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence of a crime; contraband, fruits of crime, or other items illegally possessed; property designed for use, intended for use, or used in committing a crime of violations of federal law; may be located on the **SUBJECT DEVICE**, as described in Attachment A, in violations of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(1), 2252A(a)(5)(B) and (b)(1), 2252(a)(2)(B) and (b)(1), and 2252A(a)(2) and (b)(1)

44. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.


Special Agent Andrea R. Kinzig
Federal Bureau of Investigation


SUBSCRIBED and SWORN
before me this 29th of January 2020

SHARON L. OVINGTON
UNITED STATES MAGISTRATE JUDGE

17